IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
September 7, 2011 Session

**TAVARSKI CHILDRESS v. STATE OF TENNESSEE**

**Direct Appeal from the Criminal Court of Shelby County**

**No. P-28677     Chris Craft, Judge**

**No. W2011-00060-CCA-R3-PC  - Filed November 22, 2011**

The Petitioner filed for post-conviction relief alleging ineffective assistance of counsel in conjunction with his trial that resulted in convictions of first degree felony murder and especially aggravated robbery. After an evidentiary hearing, the post-conviction court denied relief, and the Petitioner has appealed. After a thorough review of the record, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment
of the Criminal Court Affirmed**

JEFFREY S. BIVINS, J., delivered the opinion of the Court, in which THOMAS T. WOODALL and ALAN E. GLENN, JJ., joined.

Lance R. Chism, Memphis, Tennessee, for the appellant, Tavarski Childress.

Robert E. Cooper, Jr., Attorney General & Reporter; David H. Findley, Senior Counsel; William L. Gibbons, District Attorney General; Chris West, Assistant District Attorney General; for the appellee, State of Tennessee.

**OPINION**

**Factual and Procedural Background**

A jury convicted Tavarski Childress ("the Petitioner") in December 2001 of one count of first degree felony murder, one count of reckless homicide, and one count of especially aggravated robbery. The trial court merged the reckless homicide conviction into the felony murder conviction and sentenced the Petitioner to consecutive terms of life imprisonment and twenty-two years. On appeal, this Court affirmed the Petitioner's convictions but remanded

the matter to the trial court on the issue of consecutive sentencing. See State v. Tavarski Childress, No. W2004-02545-CCA-R3-CD, 2006 WL 3804418, at *1 (Tenn. Crim. App. Dec. 27, 2006), perm. to appeal denied (Tenn. Apr. 14, 2008). On remand, the trial court ordered the Petitioner's sentences to run concurrently.

The Petitioner filed for post-conviction relief, alleging that his trial counsel was ineffective. Although the Petitioner's amended petition for post-conviction relief alleges numerous grounds of ineffective assistance, his brief before this Court is limited to a single allegation: that trial counsel's cross-examination of Sergeant Robert Shemwell of the Memphis Police Department was deficient and that the resulting testimony "adversely affected the outcome" of the Petitioner's trial. A brief review of the pertinent facts adduced at trial will assist in placing the Petitioner's claim in context.

*Proof at Trial*

The Petitioner's convictions arose out of his active participation in the armed robbery of Zeke's Lounge, a sports bar and grille. During the robbery, one of the two victims was shot to death by the Petitioner's cohort, Vincent Howard. The Petitioner was fifteen years old at the time of the offenses,[1] and Howard was eighteen years old.

At trial, Jacqueline Dunlap testified that she was working at Zeke's with Richard McRoberts late on the night of January 12, 1999. The two were the only ones there. The doors were locked, and they were cleaning up and stocking the coolers. They were both behind the bar when Dunlap heard screaming. She looked up and saw a black man with a rifle. She described the man as "a tall very, very dark black man." He was screaming, "Give me all your money." According to Dunlap, a second man, whom she identified as the Petitioner, next came into the building with a pistol drawn. McRoberts handed money from the register to the first man, but the two assailants remained in the bar. Dunlap screamed, afraid the two intruders wanted more than money. She saw the rifle "reach[] over the bar to [McRoberts]," who tried to move the gun and get out of the way. Dunlap heard shots and McRoberts fell on her. She testified, "[T]he two shots I remember hearing [were] the two shots out of the pistol. After that I didn't hear anything." She was able to get out from under McRoberts and called 911.

Dunlap identified a pistol as looking like the one she had seen the Petitioner holding that night. She also identified some shattered glass in a photograph of the scene, caused,

---

[1] Pursuant to Tennessee Code Annotated section 37-1-134 (Supp. 1999), a juvenile less than sixteen years old charged with first degree murder and especially aggravated robbery may be transferred by a juvenile court to criminal court to be tried as an adult.

according to Dunlap, by the shots from the pistol. She stated that, to the best of her knowledge, the man with the rifle left with the money given to him by McRoberts. She stated that it was about $400.

On cross-examination, Dunlap reiterated that the two shots she heard were from the pistol. However, she also stated that it was the rifle that she saw aimed at McRoberts and that the first man who came in, whom she later learned was Vincent Howard, was the person who shot McRoberts. She also acknowledged that she did not see either gun fired.

Sergeant Anthony F. Craig of the Memphis Police Department testified that he took the Petitioner's statement on January 14, 1999. Because the Petitioner was a juvenile at the time, his mother was present. After the Petitioner finished his first statement, he spoke with his mother and then indicated that he wanted to make a second statement. Both statements were admitted into evidence. In the first statement, the Petitioner admitted to entering Zeke's with someone he referred to as "Ty." The Petitioner was carrying a pistol in his pocket. Ty demanded money and brandished a gun. The Petitioner stated,

> After the man gave Ty the money he tried to snatch the gun and run and that[']s when Ty started shooting. Ty shot two or three times and the man ran to the back. Ty broke and ran and bumped into me and when he bumped into me[,] I had dropped his gun. I picked the gun up and ran through the cut going back towards Watkins Manor, Ty went his own way.

The Petitioner acknowledged that he pulled his gun out of his pocket while in Zeke's, but stated that he did not point it; instead, he claimed that he kept it by his pocket. The Petitioner also stated that, after Ty demanded money, the Petitioner "told the lady[, ']Will y['all] give the man something[?']" The Petitioner described the pistol that he had as silver with brown handles; he described Ty's gun as a rifle. The Petitioner denied shooting his pistol. The Petitioner also stated that, after they ran out of the bar, Ty threatened to kill him if he told anyone about the incident.

In his second statement, the Petitioner indicated that his first statement was not correct. In his second statement, he reiterated that he and Ty were together and that Ty was carrying a .22 rifle. The Petitioner stated that he was carrying a .38. They left the Petitioner's residence, where he lived with his mother, and walked across a field. They approached Zeke's and Ty told the Petitioner that he, Ty, wanted to rob the man and woman inside. Ty told the Petitioner to go through the side door while Ty went through the front door. According to the Petitioner, Ty also "told me to go in there and put the gun on the lady. When I put the gun on the lady[,] he was gonna put the gun on the dude and tell him to give him the money." The Petitioner began to follow Ty's directions but found the side

door locked. He returned to the front door and entered the bar with his gun "out." Ty "had his gun in the man's face." When the man told him that he did not have any money, Ty cocked the rifle. The Petitioner stated that he "told the lady, 'y'all give him money.'" The Petitioner explained that he said this because he "already knew [Ty] was kind'a crazy." The man then handed stacks of bills from the cash register to Ty. The Petitioner stated, "The man tried to hit Ty's gun and run to the back so Ty opened fire and shot the man and I had shot the mirror and the wall[,] and me and Ty ran out of the club."

Another officer testified that, with the Petitioner's mother's consent, he searched their residence on January 14, 1999, and recovered crack cocaine and marijuana. On January 17, 1999, the officer returned to the Petitioner's residence and spoke with Petitioner, who told him that the .22 rifle was in a dumpster on the premises of the apartment complex where the Petitioner lived. Officers recovered the rifle from the dumpster described. The Petitioner also provided law enforcement with information that led to the recovery of the pistol.

At the crime scene, law enforcement recovered a .22 shell casing as well as (1) a copper bullet jacket and (2) a bullet, neither of which had been fired from the gun that had fired the .22 shell casing. The copper bullet jacket was recovered from the back of a cooler, the glass front of which had been shattered by a bullet. A firearms expert identified the copper bullet jacket as a ".38 caliber fired jacket." The expert also testified that the jacket and bullet recovered from the scene had both been fired from the pistol recovered during the investigation. The expert clarified that the bullet and the jacket were not parts of the same cartridge. According to the expert, another bullet that had been recovered from the victim's body had "the same class or general characteristics" produced by the .22 rifle recovered and "could not have been fired through a .38."

The police also questioned the Petitioner's cousin, Damien Jamison. Shortly before the offenses were committed, Jamison was at the Petitioner's apartment and heard the Petitioner state that "he [the Petitioner] was going to commit a robbery to get back in the dope game." Prior to this time, Jamison had seen crack cocaine "on" the Petitioner. A couple of days after hearing the Petitioner's statement about committing a robbery, Jamison observed some marijuana in the Petitioner's apartment while the Petitioner was there.

Sergeant Robert Shemwell of the Memphis Police Department testified that he was in charge of the homicide investigation in this case. On cross-examination, he explained that he developed Vincent Howard as a suspect as the result of a tip from an informant. He took Howard, who was eighteen years old at the time, in for questioning. Howard initially denied any involvement in the crimes, but later admitted to having shot McRoberts.

On cross-examination by trial counsel, Sgt. Shemwell testified that Nick Greer, a high-ranking member of the Gangster Disciples gang at the apartment complex where the Petitioner lived, informed him that the Petitioner was a member of that gang. Sgt. Shemwell also testified on cross-examination that Greer said that he had provided a .38 gun to the Petitioner and that, after the crimes were committed at Zeke's, Greer took the .38 back from the Petitioner and hid it in the doghouse from which it was later recovered.

On redirect, Sgt. Shemwell testified that Howard eventually gave an eight page statement, in which he claimed that the Petitioner was the instigator of the crimes; that they shared in the proceeds; and that they purchased marijuana with some of the money. Sgt. Shemwell also explained on redirect that Howard's mother had told him that Howard was "very slow" and was only in the ninth grade in spite of his age.

Medical testimony established that McRoberts died from a gunshot wound to his chest.

*Proof at Post-Conviction Hearing*

The Petitioner's lawyer at trial ("trial counsel") testified at the post-conviction hearing that the defense theory of the case was "to try to show that this young man was dominated and influenced by older and more experienced people, and that he was not acting as a leader; he was under, basically duress and dominance of these older, more seasoned gang members and gang-related figures," and that "Mr. Howard was the one that was responsible and was the driving force behind these crimes and that [the Petitioner], being of tender age, was just tagging along; was not necessarily responsible for his actions but just following instructions from Mr. Howard." Trial counsel acknowledged that the State was seeking convictions against the Petitioner on the theory of criminal responsibility for the conduct of another,[2] so he "was trying to point out that this young man's being vulnerable at . . . fifteen years of age was not responsible for this conduct even though he was there and going along with it more as an accessory as opposed to responsible for the crime itself."

Trial counsel recognized that Howard and the Petitioner were each trying to cast the other as the leader of the crimes in order to lessen their own culpability. Realizing that Howard's statement could be damaging to the Petitioner if believed, trial counsel decided his best option was to attack Howard's credibility:

---

[2] "A person is criminally responsible for an offense committed by the conduct of another, if: . . . [a]cting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the person solicits, directs, aids, or attempts to aid another person to commit the offense[.]" Tenn. Code Ann. § 39-11-402(2) (1997).

-5-

I think it would have been obvious, from his [Howard's] comments – from his version, that he was trying to pass the blame to [the Petitioner] for his own conduct; and that the jury would see through that as trying to blame this fifteen-year-old for this adult conduct; and that his effort to get himself out of responsibilities for these crimes would have been apparent from the way he tried to blame everything on [the Petitioner], who, I believe, again, was some fifteen years old, and he was much older; and I just thought that the jury would see through the sand of him trying to shift the blame – especially when you consider, I believe that the record showed that Mr. Howard was actually the shooter in this case.

Trial counsel reiterated: "I think it was pretty clear that [Howard] was trying to blame this young man [the Petitioner] for [Howard's] conduct."

In response to questions regarding whether trial counsel was aware of the risk that his cross-examination would "open the door" for the State to introduce other portions of Howard's statements, trial counsel stated,

in retrospect, I've speculated that my thinking would have been that the more information that came in regarding Mr. Howard's efforts to shift the blame to [the Petitioner], the more the jury would understand that this was a facade, and this was his way of trying to cast blame in order to extricate himself from this situation; and, therefore, the more he blamed [the Petitioner], the more that the jurors would understand that he's the one that's trying to cover his own butt for what happened out here.

When asked about why he cross-examined Sgt. Shemwell about Howard's statements regarding the Petitioner's gang affiliation, trial counsel responded:

[I]t was our theory that Vincent Howard was the one that was responsible for these crimes and the denomination [sic] of the gang influence by an older person over this young man was the point that we were trying to make; that this young man was being dominated by older gang members who were in charge, and he was doing what he was told to do; this is not of his own making, but he was acting under the influence of this – not only older person in Vincent Howard, but the gang influence under which [the Petitioner] was operating.

And, responding to questions about why he elicited testimony that Nick Greer provided the Petitioner's gun, trial counsel testified,

-6-

I think that . . . Nick Greer being a high-ranking . . . gang official – would fall in line with ou[r] theory of the case; that it is these older, seasoned gang members that's [sic] poisoned this child. And he is doing as he is instructed by these gang members – his superiors or people who had great influence over him.

On further questioning about why he "opened the door" with his cross-examination of Sgt. Shemwell, trial counsel testified,

I did not consciously make a decision to open the door . . . ; but I must add that whether it opened the door or not, I don't think that that's a matter that hurt the defense in this case for the codefendant to claim that a fifteen-year old was the mastermind behind everything because, in my opinion, it shows that the codefendant is trying to shift the blame for his own involvement and acts in this case to a fifteen-year old, which is what – one of the things that we were arguing from the outset in this case; that this young man here was not the leader in this case; was not the one that was in charge, but that the co-defendant's testimony, from the outset was designed to shift the guilt away from him and trying to put it on this teenager.

Trial counsel reiterated that questions about Mr. Howard's statements "would assist us in arguing the credibility of the codefendant['s] . . . testimony in this case was not believable; and it was just a ploy on their part to shift the burden away – to shift the blame away from him and put it on this young man."

Although the Petitioner also testified at the post-conviction hearing, he did not testify about trial counsel's examination of Sgt. Shemwell. No other witnesses were called.

The post-conviction court denied relief on all grounds alleged. With respect to trial counsel's strategy, the post-conviction court found it "reasonable, and probably the only viable one available under the circumstances," given that the defense had been unsuccessful in its attempt to have the Petitioner's statements suppressed prior to trial. With respect to trial counsel's cross-examination of Sgt. Shemwell, which resulted in prejudicial testimony on redirect examination by the State, the post-conviction court concluded that trial counsel

was doing everything he could to present his client in the light most favorable to their theory of defense. He was prepared to take the bad with the good, trying to make the best of a bad situation. . . . Considering counsel's perspective at the time, cross-examining the Sergeant about the contents of the co-defendant's statement seemed to be a reasonable trial strategy.

-7-

The post-conviction court also found that trial counsel did not perform deficiently when he elicited testimony from Sgt. Shemwell about the Petitioner's gang affiliation because this proof was consistent with the defense theory that the Petitioner's participation resulted from the domineering influence of the more-powerful gang members.

## Analysis

### *Standard of Review*

Relief pursuant to a post-conviction proceeding is available only where the petitioner demonstrates that his or her "conviction or sentence is void or voidable because of the abridgment of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." Tenn. Code Ann. § 40-30-103 (2006). To prevail on a post-conviction claim of a constitutional violation, the petitioner must prove his or her allegations of fact by "clear and convincing evidence." Tenn. Code Ann. § 40-30-110(f) (2006). See Momon v. State, 18 S.W.3d 152, 156 (Tenn. 1999). This Court will not overturn a post-conviction court's findings of fact unless the preponderance of the evidence is otherwise. Pylant v. State, 263 S.W.3d 854, 867 (Tenn. 2008); Sexton v. State, 151 S.W.3d 525, 531 (Tenn. Crim. App. 2004). We will defer to the post-conviction court's findings with respect to the witnesses' credibility, the weight and value of their testimony, and the resolution of factual issues presented by the evidence. Momon, 18 S.W.3d at 156. With respect to issues raising mixed questions of law and fact, however, including claims of ineffective assistance of counsel, our review is de novo with no presumption of correctness. See Pylant, 263 S.W.3d at 867-68; Sexton, 151 S.W.3d at 531.

### *Ineffective Assistance of Counsel*

The Sixth Amendment to the United States Constitution and article I, section 9 of the Tennessee Constitution guarantee a criminal defendant the right to representation by counsel at trial.[3] Both the United States Supreme Court and the Tennessee Supreme Court have recognized that this right is to "reasonably effective" assistance, which is assistance that falls "within the range of competence demanded of attorneys in criminal cases." Strickland v. Washington, 466 U.S. 668, 687 (1984); see also Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975). The deprivation of effective assistance of counsel at trial presents a claim cognizable under Tennessee's Post-Conviction Procedure Act. See Tenn. Code Ann. § 40-30-103; Pylant, 263 S.W.3d at 868.

---

[3] The Sixth Amendment right to counsel is applicable to the States through the Fourteenth Amendment to the United States Constitution. See Gideon v. Wainwright, 372 U.S. 335, 342 (1963); State v. Howell, 868 S.W.2d 238, 251 (Tenn. 1993).

In order to prevail on a claim of ineffective assistance of counsel, the petitioner must establish two prongs: (1) that counsel's performance was deficient and (2) that the deficient performance prejudiced the defense. See Strickland, 466 U.S. at 687; Goad v. State, 938 S.W.2d 363, 370 (Tenn. 1996). The petitioner's failure to establish either prong is fatal to his or her claim of ineffective assistance of counsel. Goad, 938 S.W.2d at 370. Accordingly, if we determine that either prong is not satisfied, we need not consider the other prong. Id.

To establish the first prong of deficient performance, the petitioner must demonstrate that his lawyer's "acts or omissions were so serious as to fall below an objective standard of 'reasonableness under prevailing professional norms.'" Vaughn v. State, 202 S.W.3d 106, 116 (Tenn. 2006) (quoting Strickland, 466 U.S. at 688)). Our Supreme Court has explained that:

> [T]he assistance of counsel required under the Sixth Amendment is counsel reasonably likely to render and rendering reasonably effective assistance. It is a violation of this standard for defense counsel to deprive a criminal defendant of a substantial defense by his own ineffectiveness or incompetence. Defense counsel must perform at least as well as a lawyer with ordinary training and skill in the criminal law and must conscientiously protect his client's interest, undeflected by conflicting considerations.

Baxter, 523 S.W.2d at 934-35 (quoting Beasley v. United States, 491 F.2d 687, 696 (6th Cir. 1974)). When a court reviews a lawyer's performance, it "must make every effort to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's conduct, and to evaluate the conduct from the perspective of counsel at that time." Howell v. State, 185 S.W.3d 319, 326 (Tenn. 2006) (citing Strickland, 466 U.S. at 689). Additionally, a reviewing court "must be highly deferential and 'must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.'" State v. Honeycutt, 54 S.W.3d 762, 767 (Tenn. 2001) (quoting Strickland, 466 U.S. at 689). We will not deem counsel to have been ineffective merely because a different strategy or procedure might have produced a more favorable result. Rhoden v. State, 816 S.W.2d 56, 60 (Tenn. Crim. App. 1991). We recognize, however, that "deference to tactical choices only applies if the choices are informed ones based upon adequate preparation." Cooper v. State, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992) (citing Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982)).

As to the prejudice prong, the petitioner must establish a "reasonable probability that but for counsel's errors the result of the proceeding would have been different." Vaughn, 202 S.W.3d at 116 (citing Strickland, 466 U.S. at 694). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694.

"That is, the petitioner must establish that his counsel's deficient performance was of such a degree that it deprived him of a fair trial and called into question the reliability of the outcome." Pylant, 263 S.W.3d at 869 (citing State v. Burns, 6 S.W.3d 453, 463 (Tenn. 1999)). "A reasonable probability of being found guilty of a lesser charge . . . satisfies the second prong of Strickland." Id.

Applying these principles to the case at bar, we have no difficulty affirming the post-conviction court's denial of post-conviction relief. As to the first prong of the Petitioner's ineffective assistance of counsel claim, we agree with the post-conviction court that trial counsel was pursuing a reasonable strategy in light of the facts and circumstances of the case and that his tactical decisions while examining Sgt. Shemwell were not deficient. Trial counsel was aware that Howard's statement tried to incriminate the Petitioner as being the leader in the offenses, but trial counsel was attempting to use this information to the Petitioner's advantage. Because the Petitioner has failed to overcome the presumption that trial counsel's performance in his examination of Sgt. Shemwell "'might be considered sound trial strategy,'" Honeycutt, 54 S.W.3d at 767 (quoting Strickland, 466 U.S. at 689), the Petitioner is not entitled to post-conviction relief.

As to the second prong, our review of the trial transcript reveals that, by the time Sgt. Shemwell testified, the jury already had heard substantial proof evidencing the Petitioner's guilt of the charged offenses. That proof included the Petitioner's motive for participating in the robbery at Zeke's, the eyewitness testimony about the Petitioner's active participation in the robbery, the Petitioner's own confession to his active involvement in the crimes, and the physical evidence, including the guns and bullets, that corroborated the Petitioner's statements. This proof was more than sufficient to support the Petitioner's convictions of first degree felony murder, defined (as charged in this case) as the "killing of another committed in the perpetration of . . . any . . . robbery," Tenn. Code Ann. § 39-13-202(a)(2) (Supp. 1999), and especially aggravated robbery, defined as "the intentional or knowing theft of property from the person of another by violence or putting the person in fear," accomplished with a deadly weapon and where the victim suffers serious bodily injury. Tenn. Code Ann. §§ 39-13-401(a), -403(a) (1997). Under the doctrine of criminal responsibility for the conduct of another, this proof was sufficient to establish the Petitioner's convictions even if he did not fire the fatal shot or take any of the money. See Tenn. Code Ann. § 39-11-402(2) (1997). To the extent that Sgt. Shemwell's testimony was prejudicial to the Petitioner, it was merely cumulative to the Petitioner's own admissions of culpable conduct and the eyewitness testimony of the Petitioner's active participation in the offenses. Thus, the record fails to demonstrate that there is a reasonable probability that the jury would have convicted the Petitioner of a lesser offense on either charge (or acquitted him entirely) had trial counsel conducted his cross-examination differently. Therefore, the Petitioner has failed to establish that trial counsel's conduct rendered the jury's verdict unreliable. Having

failed to demonstrate that trial counsel's cross-examination of Sgt. Shemwell was prejudicial to the defense, the Petitioner is not entitled to post-conviction relief.

## **Conclusion**

The Petitioner has failed to prove by clear and convincing evidence either prong of his ineffective assistance of counsel claim. We therefore affirm the judgment of the post-conviction court denying relief.

_____
JEFFREY S. BIVINS, JUDGE